## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| FENG (FRANKLIN) TAO, | ) | **Case No.: 2:25-cv-02005** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| UNIVERSITY OF KANSAS | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT

Plaintiff, PROFESSOR FENG (FRANKLIN) TAO, by and through his attorneys, Morvillo Abramowitz Grand Iason & Anello P.C. and Petefish Immel Hird Johnson & Leibold, LLP, for his complaint, alleges as follows:

1. Professor Tao is a leading researcher and academic in the field of chemistry and chemical engineering. He has published over 210 peer-reviewed articles and three books, and his work has been cited over 17,000 times. Professor Tao's contributions to his field have been lauded for decades, with over 20 honors and awards for his contributions in his field.

2. Professor Tao was born in China and came to the United States to pursue his PhD at Princeton University in 2002. After receiving his PhD and completing postdoctoral research at the University of California at Berkeley, Professor Tao started his independent academic career as a tenure-track assistant professor of chemistry at the University of Notre Dame. In 2014, the University of Kansas ("KU") actively recruited him and offered him a position as a tenured associate professor in the chemical engineering department. After accepting this tenured faculty position in July 2014, Professor Tao then moved his family—including his nine-year-old son and daughter—some of his team members, and his lab instruments, to KU in August 2014.

3.      From November 2018 through February 2022, the U.S. Department of Justice ("DOJ") operated a "China Initiative" which was ostensibly designed to thwart Chinese national security threats including economic espionage.  The program has been widely criticized for racial profiling, xenophobia, and discrimination against Chinese Americans.[1]

4.      In 2019, as a result of discriminatory and illegal actions taken by KU, Professor Tao became the first professor arrested under the China Initiative, with baseless and humiliating charges brought against him by the DOJ.

5.      Professor Tao endured over three years of criminal prosecution which inflicted substantial damage to his reputation, his career, his life savings, and his emotional well-being.

6.      After his arrest, KU placed Professor Tao on administrative leave, but before the criminal proceedings had concluded, it unfairly and unlawfully terminated Professor Tao.  Even after he was ultimately acquitted of all charges, KU refused to reinstate Professor Tao to its faculty.  To this day, it has not reinstated Professor Tao.

7.      KU's actions and discrimination against its own tenured professor—before, during, and after his criminal prosecution—violated its contractual, ethical, and legal obligations to Professor Tao.  Among other things, it failed to investigate wild accusations by a disgruntled visiting student who had tried to extort Professor Tao, it collected and provided false and misleading information to the DOJ, it unlawfully surveilled him on behalf of the DOJ, it collaborated with the DOJ to persecute Professor Tao, and it unlawfully terminated him before his criminal proceedings even concluded and refused to reinstate him despite his acquittal on all counts.

---

[1] *See, e.g.*, Yu Xie, et al., <u>Caught in the crossfire: Fears of Chinese-American scientists</u>, Proc. Nat'l Acad. Sci. U.S.A., June 27, 2023.

8.      KU also violated its own policies and procedures for faculty and a July 2, 2020 agreement it signed with Professor Tao, promising to wait until the end of the criminal proceedings before taking any action on his employment status.

9.      Professor Tao's life, career, reputation, and finances are in shambles as a result of KU's egregious conduct.  Rather than embracing academic rigor and enlightened, critical judgment, the university allowed itself to join in fear mongering and racist witch hunting.  It failed its own vision of being a "home to innovative research and the constant pursuit of knowledge" and to be guided by "perseverance, positivity, and restless innovation."  KU was wrong, should be ashamed of its actions, and deserves to be held accountable for the damage it caused to Professor Tao.

## PARTIES

10.      Plaintiff Franklin Tao resides in Kansas and is a citizen of Kansas.

11.      Professor Tao is a U.S. permanent resident.  He is East-Asian, Han-Chinese, and of Chinese national origin.

12.      Defendant KU is a state-supported educational institution whose main campus is located in Lawrence, Kansas.  KU is an "employer" within the meaning of Title VII and a "state actor" within the meaning of 42 U.S.C. § 1983.

## JURISDICTION & VENUE

13.      This is an employment case arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the laws of the State of Kansas.

14.      This Court has subject matter jurisdiction as this case arises under federal law and presents a federal question.  *See* 28 U.S.C. § 1331.

15.     This Court has personal jurisdiction over KU, which is a state-supported educational institution located in Kansas.  Moreover, the vast majority, if not all, of the unlawful acts and practices set forth below occurred in the State of Kansas.

16.     Venue is proper as the relevant events occurred in the District of Kansas.

17.     On June 16, 2023, Professor Tao filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII.  On October 7, 2024, the EEOC issued a Notice of Right to Sue.  Professor Tao received the Notice of Right to Sue on October 7, 2024.

**STATEMENT OF FACTS**

**The "China Initiative"**

18.     The DOJ's China Initiative was officially launched in 2018 and created task forces within the FBI and federal prosecution offices to purportedly target economic espionage. The program was terminated in 2022 because it was found to fuel racial profiling and chill advances in the U.S. scientific community.[2]  The stated goal of targeting economic espionage and hacking had turned into a focus on disclosures on academic forms.[3]  Accordingly, "[t]here was a

---

[2]  Ryan Lucas, The Justice Department is ending its controversial China Initiative, NPR (February 23, 2022, 9:15 PM), https://www.npr.org/2022/02/23/1082593735/justice-department-china-initiative; see Jenny J. Lee, et al., Racial Profiling Among Scientists of Chinese Descent and Consequences for the U.S. Scientific Community, Committee of 100 (October 28, 2021); supra n.1.

[3]  Eileen Guo, et al., The US Crackdown on Chinese economic espionage is a mess. We have the data to show it., MIT Technology Review (December 2, 2021), https://www.technologyreview.com/2021/12/02/1040656/china-initative-us-justice-department/.

clear mismatch between the severity of the crimes that the DOJ and FBI alleged publicly and the charges which the DOJ prosecuted."[4]

19.    Consistent with its name, the China Initiative targeted individuals of Chinese descent.  In addition to promoting racial profiling and bias, the China Initiative ultimately proved to be a statistical failure: "in over three years of investigations, over 150 defendants, and at least 77 cases, the China Initiative secured just one single conviction in a court of law."[5]

20.    Professor Tao was the first professor arrested under the China Initiative, and also a prime example of its racial profiling and unlawful targeting of innocent academics who happen to be Chinese.

## Professor Tao's Academic Career

21.    Professor Tao moved to the United States in 2002 after being accepted into Princeton University's PhD program.

22.    In 2006, Professor Tao received a PhD in Chemistry from Princeton University.

23.    From 2006-2010, he served as a postdoctoral fellow at the University of California, Berkeley.

24.    In 2010, Professor Tao joined the faculty at the University of Notre Dame as a tenure-track assistant professor in the Department of Chemistry and Biochemistry.

---

[4] Anton Louthan, The China Initiative and its Implications for American Universities, Foreign Policy Research Institute (April 11, 2022), https://fpri.org/article/2022/04/the-china-initiative-and-its-implications-for-american-universities/.

[5] CAPAC Members Applaud the Second Anniversary of the Termination of the China Initiative, Congressional Asian Pacific American Caucus (February 23, 2024), https://capac-chu.house.gov/press-release/capac-members-applaud-second-anniversary-termination-china-initiative.

25.    In 2014, he was recruited by KU to join its faculty as tenured associate professor in the Department of Chemical and Petroleum Engineering.

26.    Academic tenure is an employment status whereby a tenured faculty member can only be terminated for justifiable cause or under extraordinary circumstances.

27.    As part of the KU faculty, Professor Tao was also entitled to certain rights under the KU Faculty Code of Rights, Responsibilities, and Conduct.

28.    At KU, Professor Tao has taught numerous undergraduate and graduate level courses.  His research specialties include sustainable chemical transformation, energy conversion, environmental sustainability, and clean energy harvest.  He has also served as a research advisor to over 15 graduate students at the University of Notre Dame and KU.

29.    His research projects have been supported by the National Science Foundation ("NSF") and U.S. Department of Energy ("DOE").  Between 2012 and 2019, Professor Tao was awarded over $4 million across twelve NSF and DOE projects which totaled over $10 million.

30.    Professor Tao has received numerous academic awards and honors.  From KU alone, Professor Tao received the Miller Research Award in 2014, the Bellow Scholar Award in 2018, and the University Scholarly Achievement Award in 2019—the highest honor awarded to KU midcareer faculty members, recognizing "truly outstanding" scholarly contributions.

31.    In 2017, Fuzhou University, a university located in Fujian, China, contacted Professor Tao about potentially joining Fuzhou University as a professor of chemistry.

32.    In January 2018, Professor Tao brought his family to visit China to see if they liked the environment.  On that trip, Professor Tao's family decided they did not want to move to China.  Professor Tao did not accept the offer from Fuzhou University.  He never signed an employment agreement with Fuzhou University.

**The Baseless Prosecution of Professor Tao**

33.     In Spring of 2019, a visiting scholar at KU (the "Informant") emailed Professor Tao complaining about not receiving proper credit in a paper.  The Informant demanded $300,000 from Professor Tao for her allegedly unacknowledged effort and threatened to report him to the FBI for economic espionage if her demands were not met.  Professor Tao refused to be extorted.

34.     On April 30, 2019, the Informant falsely and anonymously reported to KU that Professor Tao was involved in espionage and held another full-time position in China.

35.     The very next day—without assessing the credibility of the information, without speaking to Professor Tao, and without conducting any investigation of the source, the facts, or the circumstances—KU reported the allegations against Professor Tao to the FBI, describing them as "high" importance.

36.     The university thereafter worked closely with the FBI on an investigation of Professor Tao, including unlawful surveillance of Professor Tao, the collection of incomplete and one-sided "evidence" against Professor Tao, and the fabrication of evidence against Professor Tao.  KU provided the "evidence" that became central to the government's eventual charges against Professor Tao.

37.     Rather than protecting its own faculty, KU acted as an arm of the government in prosecuting Professor Tao.

38.     For example, KU worked with the FBI to arrange a surprise search of Professor Tao's lab and home.  Text exchanges between KU's Deputy General Counsel (later promoted to General Counsel) and the FBI case agents reflect an improper collaboration between KU and the DOJ to target Professor Tao:

KU's Deputy General Counsel: "Heard you boys are heading out tomorrow, which, from a personal & totally selfish standpoint, ticks me off, as I really want my Wonder Twins present tomorrow. But duty calls. So, keep us updated. And…be careful. Seriously—if anything happens to you guys, I will kick both of your asses."

FBI: "Ok mom."

39.     Upon learning that Professor Tao had been placed in custody, KU's Deputy General Counsel congratulated the FBI by phone text: "Job well done, gentlemen. Congrats, and thanks."

40.     KU also actively worked with the government to look for evidence that could support additional criminal charges against Professor Tao, brainstorm ways to strengthen the government's case or develop additional charges, and share information learned from Professor Tao's attorneys.

41.     After finding no evidence of any espionage, the government nonetheless—with KU's assistance—prosecuted Professor Tao for purported wire fraud and false statements, centered around the job offer from Fuzhou University and Professor Tao's failure to disclose this alleged "tie" to a Chinese university to KU.

42.     Under KU's Commitment of Time, Conflicts of Interest, Consulting, and Other Employment policy, faculty members are required to submit annual conflict of interest ("COI") forms, also known as Institutional Responsibilities forms, to disclose any "significant financial interests" and "time commitments in external professional activities."

43.     The KU Research Office manages the annual COI certification process for faculty members and research staff at KU.

44.     Prior to 2020, other than automated reminders, the KU Research Office did not enforce the requirement to submit annual COIs.

45.     Upon information and belief, the KU e-compliance system generated a September 2018 COI form for Professor Tao that he neither certified nor submitted.

46.     On August 21, 2019, based largely on "evidence" provided by KU, the government arrested and charged Professor Tao with one count of wire fraud and three counts of program fraud.  The wire fraud count alleged that Professor Tao submitted a COI form in September 2018 that failed to disclose his relationship with Fuzhou University.  The program fraud counts alleged that by failing to disclose his relationship with Fuzhou University on the form, Professor Tao defrauded KU of his salary, and the federal funding agencies.

47.     On January 15, 2020, the government filed a first superseding indictment, charging Professor Tao with two counts of wire fraud and one count of program fraud.  On June 24, 2020, the government filed a second superseding indictment, charging Professor Tao with seven counts of wire fraud and three counts of false statements.

48.     Upon his arrest, KU placed Professor Tao on administrative leave and banned him from campus.  KU threatened to have him arrested if he appeared on campus.

49.     In October 2020, KU's radio station, Kansas Public Radio ("KPR"), which covers urban and rural areas of Kansas as well as parts of Missouri, broadcast a false news story that Professor Tao was arrested for being a spy who stole intellectual property and secretly worked for a university in China while employed at KU.  Despite requests to do so, KU and KPR refused to correct the false and defamatory statement until Professor Tao's counsel demanded they do so, and then only printed a one sentence correction on the website.

**The University of Kansas Terminates Professor Tao**

50.     The KU Faculty Code of Rights, Responsibilities, and Conduct ("FCRRC"), Article VI, states that "[s]anctions of censure, suspension, or dismissal shall be applied only after

the faculty member has the opportunity for a hearing before the Faculty Rights Board." Article III.7 further states:

> Faculty members have a right to due process in all disciplinary matters. Faculty members have the right to peer judgment through the hearing process. The sanctions listed in Article VI of this Code may not be imposed upon a faculty member without notice of the charges against him or her and the opportunity to request a hearing before the Judicial Board or the Faculty Rights Board.

51.     The KU Procedure for Appeals to the Faculty Rights Board for Tenure and Promotion Decisions (the "Procedure for Appeals") provides that, after the provost makes a negative recommendation on tenure, the faculty member may file an appeal with the Faculty Rights Board ("FRB") and request a hearing on the provost's recommendation.

52.     On September 17, 2019, before trial, the KU Provost recommended dismissal of Professor Tao as a tenured faculty member (the "Proposed Administrative Action").

53.     On February 14, 2020, the KU Provost informed Professor Tao that, based on KU's final investigative report and information Professor Tao provided in meetings with KU, recommending Professor Tao's termination "is still appropriate." Two weeks later, on February 28, 2020, the Provost notified Professor Tao of KU's intention to formally dismiss him on March 9, 2020.

54.     On April 6, 2020, the Provost sent a letter to the FRB listing a Statement of the Charges and stating that the FRB will conduct a hearing on the charges at a time and place to be communicated to Professor Tao.

55.     On April 20, 2020, Professor Tao appealed and requested a hearing on the Proposed Administrative Action to the FRB under the Procedure for Appeals.

56.     On July 2, 2020, Professor Tao and KU's Provost signed an agreement (the "July 2, 2020 Agreement") to suspend the appeal and any FRB hearing under the Procedure for

Appeals until the conclusion of the criminal proceeding.  A true and correct copy of the July 2, 2020 Agreement is attached hereto as Exhibit A.

57.    The July 2, 2020 Agreement includes provisions that state:

3. At the conclusion of the Criminal Proceeding, the University has the right to reinstate the Proposed Administrative Action . . .
. . .

10. The Parties agree that if the Criminal Proceeding results in a conviction, Dr. Tao's dismissal as a tenured faculty member will be a final administrative action, and Dr. Tao waives his right to appeal the dismissal or request a hearing before the FRB, except with respect to the University's decision to seek restitution. If Dr. Tao is convicted in the Criminal Proceeding, the University will notify Dr. Tao of any Proposed Administrative Action seeking restitution, which Dr. Tao shall have the right to appeal.

11. The Parties agree that if the Criminal Proceeding is dismissed or results in an acquittal, Dr. Tao's appeal of the Proposed Administrative Action, if reinstated or revised by the University, will be unabated, and the University will resubmit a Statement of Charges to the FRB.

58.    On or about March 22, 2022, Professor Tao's trial on six counts of wire fraud and two counts of making a false statement began.[6]

59.    During the trial, KU's Assistant Vice Chancellor for Research falsely testified that Professor Tao submitted the September 2018 COI form.

60.    On or about April 7, 2022, a jury found Professor Tao guilty on three counts of wire fraud and one count of making a false statement, and found him not guilty on the remaining four counts.  Professor Tao immediately moved for acquittal on those counts notwithstanding the verdict.

61.    On April 15, 2022, KU in-house counsel informed Professor Tao that it intended to proceed with termination because of the jury verdict.

---

[6] On February 14, 2022, the District Court granted the Government's unopposed Motion to Dismiss Counts Three and Eight of the second superseding indictment, leaving eight counts remaining.

62. In response, on April 19, 2022, Professor Tao's lawyer stated to KU in-house counsel that the criminal action had not yet concluded because a "conviction" under the law requires that "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." KU did not respond.

63. On September 20, 2022, the District Court acquitted Professor Tao on the three wire fraud counts on the ground that "the evidence was legally and factually insufficient to support Tao's wire fraud convictions." Therefore, only one count of false statement remained. Court also concluded that "there is no evidence that Tao's conduct put KU or NSF at any risk of loss."

64. On January 6, 2023, without waiting for sentencing or the appeal process, and without holding a hearing as required by KU's own rules and policies, KU terminated Professor Tao's tenured position.

65. On January 18, 2023, the District Court held a sentencing hearing on the remaining false statement conviction. During this hearing, KU made disparaging, baseless comments against Professor Tao, and KU's Assistant Vice Chancellor for Research testified that Professor Tao caused financial damage to the university. Relying on this, the DOJ sought restitution from Professor Tao.

66. The District Court criticized KU's assertion that Professor Tao had caused damage and neglected his responsibilities:

> I went into this trial frankly thinking I was going to hear evidence that there was a loss. . . . I thought frankly what I might hear at trial and I never heard was that he wasn't entitled to his salary at KU because during the semester or whenever he was in China, he wasn't doing any work for KU so he was double-dipping so to speak and pulling a salary from KU that he didn't earn. But I didn't hear that. I heard the contrary. I heard that this is a man that is obsessed with his work. . . . I

heard even when he was in China, Germany, or wherever he might be, he worked
[his students] to death and he worked himself to death. And he earned his salary at
KU. . . . What I heard . . . was that wherever Dr. Tao was, . . . he was on the
phone, he was emailing his post-docs and his graduate students and he worked
them to death, and it was as if he was there full time. . . . He did the work he was
supposed to do.

67.     The District Court denied the Government's request for restitution and KU's

claim of damage, concluding that "[t]here was no loss proved at trial. The things that the

government argues now in terms of being a loss, there was no evidence of such, and they don't

constitute loss.", and "[t]here's no loss from the fact that KU paid him a salary. There was no loss

in federal research dollars. There was no evidence that the research wasn't conducted, that NSF

and DOE for that matter did not receive what they paid for in terms of research and all that that

entitled."

68.     On January 25, 2023, Professor Tao filed a notice of intent to appeal his

conviction on the sole count of making a false statement in violation of 18 U.S.C. 1001.  In that

appeal, Professor Tao argued that the evidence at trial was insufficient to sustain the conviction.

69.     On July 11, 2024, the Court of Appeals for the Tenth Circuit agreed with

Professor Tao and reversed his conviction, finding that the Government failed to carry its burden

to prove that the alleged false statement was material, and remanded the case for the district

court to enter a judgment of acquittal.  Specifically, the Appellate Court found that "the evidence

supports neither [of the Government's] materiality theor[ies]," that some of the Government's

assertions were made "without analysis," and that the Government made assertions that "border[]

on misrepresentation."  The Appellate Court further admonished the Government that, "as should

be obvious, the government may not manufacture materiality by charging someone with a federal

crime."

70.     On July 26, 2024, Professor Tao wrote to KU to request the reinstatement of Professor Tao's tenured faculty position.

71.     On August 20, 2024, KU refused to reinstate him to a tenured faculty position, but noted that he would have unpaid administrative status so that he could request an appeal.

72.     On September 6, 2024, KU issued a revised Proposed Administrative Action, again recommending dismissal.  To date, KU has not reinstated Professor Tao.

**The University of Kansas's Disparate Treatment of Professor Tao**

73.     KU's intentional discrimination against Professor Tao is evident from the factual circumstances and the fact that other faculty members who are not of Chinese descent and national origin, who had significant interactions with foreign universities, were not targeted, disparaged, reported to law enforcement, or subjected to adverse employment action for failing to include those interactions on COIs.

74.     For example, upon information and belief, Comparator Professor 1 ("CP 1") is non-Chinese and has been a KU professor since 2007.  CP 1 was a guest professor at a German university in 2015 and 2018.

75.     Similarly, upon information and belief, Comparator Professor 2 ("CP 2") is non-Chinese and has been a KU professor since 1984.  CP 2 has had several connections to foreign universities, including as a vising professor at a French university from 1995 through 2002, 2006 through 2007, and 2009 through 2010; a visiting scholar at a Chinese university from 2004 to present; and a Fulbright scholar at a Ukrainian university in 2005.

76.     Comparator Professor 3 ("CP 3") is non-Chinese and, during his tenure as a professor at KU, was also a visiting professor at a Japanese university in 2007.

77.      Comparator Professor 4 ("CP 4") is non-Chinese and has been a KU professor since 2009.  CP 4 was a visiting professor at a Japanese university from 2019 through 2020 under a fellowship program.

78.      Comparator Professor 5 ("CP 5") is non-Chinese and was employed by KU between 2005 and 2019.  CP 5 had several connections to universities outside of the U.S., including as a visiting professor at a British university and a Chinese university between 2016 and 2019 and coauthor of at least one research article in which he listed his affiliation as both KU and a foreign university.

79.      Comparator Professor 6 ("CP 6") is non-Chinese and was employed by KU from 2008 through 2023.  CP 6 had several connections to universities outside of the U.S., including an appointment as a chair professor at a Chinese university between October 2013 and October 2016 through a China talent program, and an appointment as a professor at a different Chinese university between May 2015 and May 2018.  CP 6 co-authored at least one publication in 2016 in which he listed his affiliation as both KU and a Chinese university.

80.      Comparator Professor 7 ("CP 7") is non-Chinese and was employed by KU from 1998 through 2023.  CP 7 had several connections to universities outside of the U.S., including an appointment as a professor with a French university in 2009, appointments as a professor at two different Chinese universities in 2012 and 2013, and as co-author of a number of publications of research funded by the Chinese government and a Chinese university in 2017-2020.  CP 7 also received certificates and awards in 2015 and 2013 from a Chinese university and a Chinese municipal government.

81.      Comparator Professor 8 ("CP 8") is non-Chinese and has been a KU professor since 2006.  CP 8 has had several connections to Chinese universities, including as a visiting

research speaker at an institute of the Chinese academy of Science at Chongqing in 2014. CP 8 also co-authored a few publications of research solely funded by the Chinese government.

82.    Comparator Professor 9 ("CP 9") is non-Chinese and has been a KU professor since 1996. CP 9 has had connections to a Chinese university since at least 2012, including as a visiting professor.

## CLAIMS

### COUNT I
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*
Discrimination on the Basis of Race, Color, and National Origin**

83.    Professor Tao restates and realleges paragraphs 1-82 as if fully set forth herein.

84.    Professor Tao is East-Asian, Han-Chinese, and of Chinese national origin. Professor Tao is therefore a member of a protected class as defined by Title VII.

85.    KU is a covered employer as defined in Title VII.

86.    Following the unsubstantiated reports made by a disgruntled visiting scholar against Professor Tao, KU continued to subject Professor Tao to a pattern of flagrant discrimination due to the fact that he is Chinese. This vicious, unabated discrimination ultimately culminated in Professor Tao's termination, which was an adverse employment action in violation of Title VII, 42 U.S.C. § 2000e-2.

87.    KU's discriminatory actions include but are not limited to: (1) immediately reporting Professor Tao to law enforcement based on a false and anonymous report without conducting any investigation of the source, facts, or circumstances of the allegations; (2) subjecting Professor Tao to an unlawful surveillance on behalf of the DOJ; (3) collaborating with the DOJ to persecute Professor Tao; (4) subjecting Professor Tao to irreparable reputational

damage; and (5) terminating Professor Tao in violation of the July 2, 2020 Agreement and KU's own policies and procedures.

88.    KU's intentional discrimination against Professor Tao is evident from both the factual circumstances and the fact that similarly situated employees—other professors who are not of Chinese descent and national origin, who had interactions with foreign universities, and who did not disclose these engagements on the relevant COI forms—were not targeted, disparaged, reported to law enforcement, or subjected to adverse employment action for failing to include those interactions on COIs. Accordingly, Professor Tao was subjected to disparate treatment compared to other similarly situated employees in violation of Title VII.

**COUNT II**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)** *et seq.*
**Wrongful Termination on the Basis of Race, Color, and National Origin**

89.    Professor Tao repeats and realleges paragraphs 1-88 as if fully set forth herein.

90.    Professor Tao was highly qualified for his position at KU as a tenured professor of chemistry and chemical engineering. He is a leading scientist and academic in his field who has published over 210 peer-reviewed articles and three books; he has also received over 20 honors and awards for his contributions to his field. Recognizing Professor Tao's uniquely impressive qualifications, KU awarded him the University Scholarly Achievement Award in 2019—the highest honor awarded to KU midcareer faculty members, recognizing "truly outstanding" scholarly contributions.

91.    KU's termination of Professor Tao was motivated by non-legitimate, discriminatory reasons, which is evident from both the factual circumstances leading up to his termination and the fact that similarly situated employees—other professors who are not of Chinese descent and national origin, who had interactions with foreign universities, and who did

17

not disclose these engagements on the relevant COI forms—were not terminated for failing to include those interactions on COIs. Accordingly, Professor Tao was subjected to wrongful termination in violation of Title VII.

**COUNT III**
**42 U.S.C. § 1983**
**Discrimination on the Basis of Race, Color, and National Origin**

92.    Professor Tao repeats and realleges paragraphs 1-91 as if fully set forth herein.

93.    KU is a public university and is a state actor for purposes of a § 1983 claim.

94.    As demonstrated above, KU subjected Professor Tao to a pattern of flagrant discrimination due to the fact that he is of Chinese descent and national origin.

95.    KU's discriminatory actions include but are not limited to: (1) immediately reporting Professor Tao to law enforcement based on a false and anonymous report without conducting any investigation of the source, facts, or circumstances of the allegations; (2) subjecting Professor Tao to an unlawful surveillance on behalf of the DOJ; (3) collaborating with the DOJ to persecute Professor Tao; (4) subjecting Professor Tao to irreparable reputational damage; and (5) terminating Professor Tao in violation of the July 2, 2020 Agreement and KU's own policies and procedure for faculty.

96.    KU's intentional discrimination against Professor Tao is evident from both the factual circumstances and the fact that similarly situated employees—other professors who are not of Chinese descent and national origin, who had interactions with foreign universities, and who did not disclose these engagements on the relevant COI forms—were not targeted, disparaged, reported to law enforcement, or subjected to adverse employment action for failing to include those interactions on COIs.

97.     Accordingly, KU, acting under color of state law, deprived Professor Tao of his constitutional right to equal protection on the basis of race, color, and national origin, in violation of 42 U.S.C. § 1983.

## COUNT IV
## Breach of Contract

98.     Professor Tao repeats and realleges paragraphs 1-97 as if fully set forth herein.

99.     KU's own faculty policies, as codified in the FCRRC, provide faculty members with the right to due process and require that the sanction of dismissal shall be applied only after a faculty member has the opportunity for a hearing before the FRB.  The KU Procedure for Appeals also provides that a faculty member has the right to an appeal of a negative recommendation on tenure.

100.    During the criminal proceeding, Professor Tao and KU entered into an agreement on July 2, 2020 (the "July 2, 2020 Agreement") whereby:

3. At the conclusion of the Criminal Proceeding, the University has the right to reinstate the Proposed Administrative Action . . .
. . .

10. The Parties agree that if the Criminal Proceeding results in a conviction, Dr. Tao's dismissal as a tenured faculty member will be a final administrative action, and Dr. Tao waives his right to appeal the dismissal or request a hearing before the FRB, except with respect to the University's decision to seek restitution. If Dr. Tao is convicted in the Criminal Proceeding, the University will notify Dr. Tao of any Proposed Administrative Action seeking restitution, which Dr. Tao shall have the right to appeal.

11. The Parties agree that if the Criminal Proceeding is dismissed or results in an acquittal, Dr. Tao's appeal of the Proposed Administrative Action, if reinstated or revised by the University, will be unabated, and the University will resubmit a Statement of Charges to the FRB.

101.    KU terminated Professor Tao prior to the conclusion of the criminal proceedings and without holding a hearing before the FRB.  Accordingly, KU breached the July 2, 2020 Agreement and its obligations as set forth by its own policies.

19

**COUNT V**
**42 U.S.C. § 1981 – Discrimination on the Basis of Race**

102.    Professor Tao repeats and realleges paragraphs 1-101 as if fully set forth herein.

103.    As demonstrated above, KU subjected Professor Tao to a pattern of flagrant discrimination, ultimately concluding in the termination of his contract as a tenured professor, due to the fact that he is Chinese.

104.    KU's intentional discrimination against Professor Tao is evident from both the factual circumstances and the fact that similarly situated employees—other professors who are not of Chinese origin, who had interactions with foreign universities, and who did not disclose these engagements on the relevant COI forms—did not have their employment contracts terminated for failing to include those interactions on COIs.

105.    Accordingly, KU deprived Professor Tao of his right to enforce his employment contract to the full and equal benefit of all laws as enjoyed by other citizens by terminating him in violation of 42 U.S.C. § 1981.

**COUNT VI**
**Fourteenth Amendment**
**Deprivation of Procedural Due Process**

106.    Professor Tao repeats and realleges paragraphs 1-105 as if fully set forth herein.

107.    As a tenured professor at a public university, Professor Tao possesses a property interest in his tenure.

108.    As established above, KU terminated Professor Tao without holding a hearing or completing his appeal of the Proposed Administrative Action.

109.    Accordingly, KU deprived Professor Tao of his right to procedural due process by terminating his tenure in violation of the Fourteenth Amendment and KU's own policies.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing, Professor Tao respectfully requests the

following relief:

(a) an order requiring that KU reinstate Professor Tao to his tenured position;

(b) an award of damages for lost wages;

(c) an award of damages for reputational injury, emotional distress, pain and suffering, and

punitive damages;

(d) an award of reasonable attorneys' fees and costs; and

(e) such other relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues which may be so tried.

Dated: January 3, 2025                  Respectfully submitted,

Matthew Donnelly (23354)
**PETEFISH IMMEL HIRD**
**JOHNSON & LEIBOLD, LLP**
842 Louisiana Street
Lawrence, KS 66044
Phone: (785) 843-0450
Facsimile: (785) 843-0407
Email: mdonnelly@petefishlaw.com

Karen R. King (*pro hac vice* forthcoming) (3933512)
Catherine M. Foti (*pro hac vice* forthcoming) (2067585)
Elena R. Syman (*pro hac vice* forthcoming) (6132294)
**MORVILLO ABRAMOWITZ GRAND**

**IASON & ANELLO PC**
565 Fifth Avenue
New York, NY 10017
Phone: (212) 856-9600
Facsimile: (212) 856-9494
Emails: kking@maglaw.com; cfoti@maglaw.com;
esyman@maglaw.com

*Attorneys for Plaintiff*